United States v. Carlos Martinez-Santiago Good morning. Mr. Rafael? Yes, Your Honor. May it please the Court, my name is Michael Rafael. I represent the appellant, Carlos Martinez-Santiago. I'd like to reserve two minutes of my time for rebuttal. The offense-level enhancement in Section 3C.1.2 of the Sentencing Guidelines applies only where the government should, by preponderance of the evidence, that the defendant recklessly created mortal danger to another person while fleeing from law enforcement. Is another person a police officer, or is it someone other than a police officer? Another person can be a police officer, Your Honor, and the cases that we've cited establish that fact. However, the police officers need to be placed in an area where there is danger. In this case, there certainly was an area where there was danger, immediately around the defendant, bounded on three sides by solid walls. Around the police officers, there was no danger. They were standing 60 feet away from him when they shot their guns towards him when he raised an unloaded weapon towards them. Well, no one knew it was unloaded, except, I don't know, maybe even he didn't know it was unloaded, but when he points a gun at them, doesn't that very act, as the government says, explain why the government's wrong in asserting that pointing a firearm at armed police officers doesn't create a dangerous situation for everybody involved. Yes, Your Honor. The fact that he raised an unloaded weapon at the police officers did not create a substantial risk. What's required here is a substantial risk of death or serious bodily injury. In this case, when he pointed an unloaded gun at officers who were 60 feet away, he had no chance, no way of harming those officers. Is it the unloaded part that's significant to you? Yes, Your Honor, it is. And even though the police, I mean, he didn't say, this is unloaded, right? Right, Your Honor. So, he lifts a gun, points it at them, they don't know it's unloaded. Correct, Your Honor. How can the fact that it's unloaded be legally determinative? Well, Your Honor, because the danger, like I said, the area of danger here was around the defendant, from the bullets fired from the officers' guns. When he pointed the gun at them, he had no way of causing them any harm. Pointing the unloaded weapon at them caused them to raise their guns against him in self-defense, and certainly that created an area of mortal danger around him. We don't dispute that. And you don't, but you dispute the possibility that gunplay, that is, firearms going off, can't cause a danger to anybody else except for the person toward whom they're fired. There's no associated danger with ricochets or misfires or anything like that in the defense view? On the facts of this case, Your Honor, no, there is no such danger in this case. Because there were no bystanders? Correct, Your Honor. The evidence showed that there were no bystanders whatsoever who were within that area of danger, bounded on three sides by solid walls. The police officers here were standing side by side, 60 feet away from the defendant when they fired their guns at him. The only danger they created was to him, and there was no other person in that area to be placed in danger by him causing them to raise their guns and fire them in self-defense. On these facts, Your Honor, because there was an absence of another person in the area of substantial risk, and no substantial risk where there were people, 3C1.2 and the two-level defense level enhancement cannot apply, and it was error for the district court to apply the enhancement on these facts. But the words 3C1.2 is when the defendant recklessly creates a substantial risk of death or serious bodily injury to another person in the course of fleeing from law enforcement. Yes, Your Honor. And you're just saying that there wasn't any possibility that anyone else could be injured besides himself if he had been hit with one of the bullets shot by the police? Your Honor, I can't, and the district court could not, on this record, make that conclusion. And therefore, the evidence fails to support the application of the enhancement. When you say it couldn't, is that because of something the court said, or is that your assertion that in the defense frame of mind, it would be impossible for the police officers firing their weapons to do damage to anybody else, to risk harm to anybody else except the defendant? On the facts of this case, Your Honor. So if I understand you right, you're saying it's preposterous and therefore not within the bounds of rational consideration to think that these weapons going off could ricochet or pierce a wall, or a gun could misfire, or a police officer pulling his weapon might accidentally fire it not in the exact direction of the defendant. And all those things are beyond the pale in order for your argument to work, right? No, Your Honor, not at all. Any of those things is plausible. Any of those things is possible. But the government submitted no evidence whatsoever that any of those things could or would occur in this situation. Absent any testimony to that end, there's no evidence on the record by which the district court could come to its decision that the defendant recklessly endangered another person aside from himself during a flight from law enforcement. So you're saying possibility does not equal substantial risk? That's exactly right, Your Honor. And that's what the Seventh Circuit said in the Smith case. So we make our decision on the basis of hindsight as to what we later find out to be the case. No, Your Honor. I think you make the decision and the district court makes the decision based on the record evidence available to it at the time and what's in the consideration of both the defendant who was engaged in a flight from law enforcement and the law enforcement officers, the bystanders at the time. If the gun were loaded, is your analysis the same or not? No, Your Honor, it's not. If the defendant's gun were loaded, if there were a possibility that he could misfire in the direction of the officers or while fleeing could drop the gun and cause it to go off and hurt one of the pursuing law enforcement officers, then the analysis would be very different, and that would be closer to the large case cited by the government. Why is, other than the fact that when Hopes police officers are more skilled than your average street criminal with firearms, when Hopes, why is it any more plausible or serious to say, you know, he's running away, he could drop his gun, than to say they're chasing them, they could drop their gun? Because in this case, Your Honor, there was no point before the police reached the defendant when he was cornered in that alley where the officers had their guns drawn. There was no point on the record where the officers were pursuing him and had their weapons out, aside from very shortly before they cornered him in that alley, when John Sauer, the investment consultant at the bank, said, he's got a gun, which was not something that the defendant caused the police to do. The defendant did not cause, before that point, the police to draw their weapons, but rather, it was a bystander giving information to a police officer. So a bystander who's witnessing all this. Correct, Your Honor. But a bystander who, at that point, had seen him with a gun at the bank, then seen him again in a side alley, and made no mention of the gun, and assumed, at that time, that he continued to be armed, out of an abundance of prudence, which was a service to the police officers, and we don't disagree with that. But it was the defendant, and the PSR specifically anchored the application of the enhancement to this fact, it was the defendant pointing the gun at the police officers that caused them to fire, that the PSR found was the crucial fact for the application of 3C1.2 in this case. And because the pulling of that gun, the brandishing of that gun at that point, an unloaded gun, which, even if the defendant had thrown, probably could have reached and hit the police officers and caused them injury, instead caused the police officers to fire the defendant in self-defense, causing an area of danger around him, a very specifically bounded area of danger. And that's your... I think it's fair to say, based on what you've told us in your briefing here, that your entire argument rests on the assertion that that area of danger could only have existed in the immediate vicinity of the defendant in the alley, right? No, Your Honor, it doesn't... It certainly does attend to the facts adduced on the record, and the only facts we have on the record say that that was the only area of danger. But... Then how does your argument work if we don't accept that premise? Well, Your Honor, the argument works because there's no evidence of any danger outside of that area. Certainly, there was a house there, there was a building behind the defendant. The government could have induced evidence that there was a person in that house, that the bullet could have pierced the wall, that the bullet could have ricocheted to another area. But it made no effort to produce that evidence. Well, what is... I'm a little unclear as to what burden the government has in a situation like this. I mean, are you saying that they have to bring in an expert saying that bullets might have ricocheted off the walls, or the walls were so thick that... Or there were no windows, so that a bullet that was fired would not enter a house, or a business, and possibly harm someone else? No, Your Honor. I think that could be done with lay testimony, and moreover, it could have been done with the witnesses that the government presented at trial. The officers themselves could testify, as Judge Jordan suggested, that the guns could have misfired when they pulled them out of their holsters, or that the gun could backfire when the officer pulled the trigger. The ballistics officer that testified that the gun was, in fact, an operable gun could have testified about ricochets, about the speed of bullets, about the ability of bullets to pierce walls, to go through a window. The government could have... could have deduced evidence of a person in the structure behind or to the side of the defendant when the officers fired the bullets at the defendant, but they made no such effort. The government even had evidence that there was a window on the wall behind the defendant, but made no effort to show that there was a person inside that structure. And finally, the government had evidence that there were, in fact, strike marks on the ground and on the metal fire escape stairs in front of the defendant that suggested a possibility of a ricochet, but then made no effort to find out where those bullets had gone. And so you're saying, as a matter of law, the burden rests on the government to... I mean, how far would they have to go? Would they have to bring in a ballistics person and an expert in geometry to explain ricochet patterns? Or at some point, is the district judge entitled to say, you know what? Guns going off all around in an alley, that's a little bit, you know, that's a danger. Where do you draw the line that says that's enough for a judge to make a finding of danger? Your Honor, the standard is by preponderance of the evidence, and I think that expert testimony along those lines is not necessary. The evidence here was that there were a set of metal fire escape stairs behind which the defendant was hiding and a solid wall behind him. The ballistics expert could testify that the bullets were traveling at a speed sufficient to cause a ricochet to go over the walls behind and around the defendant, but there was no such testimony here. And the ballistics expert could further testify, or the police officers who captured the defendant could themselves testify that a bullet could pierce the wall behind the defendant, but the government made no such effort here. Assuming the gun were loaded, would the government still have to present that kind of testimony to qualify as a substantial risk? No, Your Honor, I don't think it does, because it changes the situation. Why? What's the difference? Why? Because it creates a new zone of danger around the officers. In this case, the only zone of danger is around the defendant because the officers are the only ones with loaded guns who are shooting at him. If he's pulling a weapon on them, a loaded weapon, pointing it at them at the end of that 60-foot alley where they're standing, then he's capable of doing them harm, and there's a possibility of him, in a nervous fit, at the time he was high on drugs, firing at them out of fear, out of nervousness or intentionally, thereby creating a zone of danger necessary to ground the application of the enhancement. Absent that type of evidence, absent a loaded gun in his hands, and given the boundary area in which there was danger here based on the record of facts, the application cannot apply, and the district court argued in finding that it could. Just to... You made an argument that application note 4 to 2K2.4... Yes, Your Honor. ...is at odds with 3C1.2, but isn't 3C1.2 a victim-related adjustment, whereas what we're talking about under elsewhere in 2 is a specific offense characteristic? Your Honor, I would argue that 3C1.2 is not a victim-related enhancement, but rather a conduct-related enhancement. It's the attempt to evade capture, to obstruct justice. And in this case... And possibly put others in danger of doing so. Correct, Your Honor. But in this case, as applied... I'm sorry, Your Honor. I'm just adding that your argument on that was that no one else was in danger but him. Correct, Your Honor. In this case, I see my time has expired. I'll complete my answer. In this case, as applied to the facts of this case, the conduct that grounds the application of 924C and the conduct that grounds the application of 3C1.2 are both weapon enhancements. It's the brandishing of the gun during the offense, which continues through from the time of the bank robbery to the end of the flight, which is when the police pinned him on the ground after he had surrendered the unloaded gun and laid face down. Based on these facts, 3C1.2 is a weapons enhancement. An application of 422K2.4 prohibits the simultaneous application of both. Thank you, Your Honor. But are these separate instances? I'm sorry, Your Honor? You have one that's a use of a gun in connection with a robbery. Two is the use of a gun in connection with a fleeing attempt involving the police. Correct, Your Honor. But under 1B1.3, the offense conduct is the same. It continues throughout from the moment of the robbery to the end of the flight. And under 2K2.4, this is analogous, I would argue, if the defendant has multiple guns in the course of a continuing offense, then you don't punish him multiple times under 924C for multiple guns. You punish him once because it attacks the same harm. Here, you have one gun but two brandishings in the same course of offense conduct. But two different incidents. One's the robbery. One's the fleeing in the incident with the police officer. Correct, Your Honor. But under the guidelines 1B1.3A, all of this is defined as the offense conduct. And as such, 3C1.2 and 2K2.4, 924C, should not apply simultaneously. Good. Mr. Refio, thank you very much. Mr. Brown. Good morning, Your Honors. May it please the court. My name is Kenneth Brown. I represent the government in this appeal. As an initial matter, Your Honors, I'm going to take issue with two of the factual statements made by the defense, both in their briefs and in their argument to this court, because the defense made great strides to show that there was only harm toward Mr. Santiago in a small, confined area. And the record simply doesn't support that. The first issue is the defense said repeatedly in their brief and all but one time up here that the defendant was surrounded by three solid walls. And that's simply not correct. On page 241 of the appendix, there was testimony at trial, including a photographic exhibit, government exhibit number five, that there was a window on the same back wall where the defendant was cornered after a second-arm bank robbery in four days. So we're not talking about three solid walls. We're talking about a window in the back wall, which, as the defense essentially conceived... He said there was a window. At one point he did, Your Honor. That's correct. But in the brief, they talk repeatedly about three solid walls, including at their reply brief at page one. The second issue is the defense makes at least the insinuation that the two officers that fired, Officer Wagner and Officer Cole, are essentially standing directly side-by-side each other as if they're standing on a firing line. Again, that's reply brief for the defendant at page one. And that's not what the trial testimony was. Mr. Raffio wasn't the trial counsel. According to Officer Cole's testimony, and this is at page 231 through 232 of the appendix, after the defendant is cornered and he's in a superior tactical position because he's behind the iron or steel stairs on the fire escape. So he's actually aiming down at the officers. He's ignored repeated commands to drop his gun, go prone, get down, surrender to the police. The officers know he has a weapon. He refuses Officer Wagner's commands. He refuses Officer Cole's commands. And as Officer Cole is saying, drop it, drop it, Santiago is actually leaning down toward the officers with the pistol as if he's taking aim. According to Officer Cole's testimony, the weapon was pointed directly at myself and at Officer Wagner. At that point, Officer Cole fires two shots, and then, according to Officer Cole's testimony, I heard one round go off behind my right side, which is where Officer Wagner was according to the trial testimony. That certainly talks about an actual substantial risk of death or serious bodily injury to a law enforcement officer during flight. Where's your record cite for that, sir? That's the appendix at pages 231 through 232. So you're saying that the fact that one officer was standing next to an officer and shot was putting the first officer in danger? That's correct, Your Honor, because they're not side by side. And although there was no testimony due to the possibilities of misfires... How far apart were they? The record is unclear, but it was, in fact, a matter of feet. According, I think we need to take the testimony as a whole. I can't, as I stand here, point directly to the record. Was it like one was where you are and the other was like where Mr. Epstein is behind you or what? It's my understanding it's certainly no more than that. This is a relatively confined space. Was it that far behind you? Do we really know? I don't know that that's clear from the testimony, Your Honor. But, again, we are talking about around fire behind the right side. If there's one group that you would seem to have the training to know not to fire in a way that would put another officer in danger, it would be police. And certainly, Your Honor, in most cases that's correct. Law enforcement goes through rigorous training regarding firearms and they're taught to keep their weapons clean and to practice. But there's always the possibility or there's always the risk. And that's not something that requires expert testimony in the government's opinion or even lay testimony. It's essentially common knowledge that any time anyone fires a handgun, there's a possibility of a misfire, there's a possibility of ricochet. And in those circumstances... Is that sufficient to meet your burden of proof preponderance of the evidence? The defense seems to be saying that the prosecution has to come up with something more. It doesn't have to be expert testimony, but there has to be testimony about ricocheting and positions and so forth and so on. Specific findings have to be made on that. Is that correct or incorrect? Your Honor, in the government's view, that's not correct. 3C1.2 talks about a defendant recklessly creating a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer. We're just talking about risk. We're not talking about the government has to show actual risk. And the judge, in this case Judge Bailson, can certainly, I think, make findings based on common sense and human experience, although certainly expert testimony, I guess, is another option. Is there a difference between risk and actual risk? I think there is, Your Honor. Certainly... Well, if there is, then doesn't that help out your opponent? I mean, the question that I hear Mr. Raffaele, in effect, asking you and us, is how can we say there's a substantial risk of danger here when they did nothing more than say officers were pointing guns out and shooting at the defendant? How can you...you have to do some extrapolating, and they didn't do anything to do that extrapolation before the district judge, and that's the problem. What's the fault in that reasoning? Your Honor, I would indicate that, again, the guideline itself talks about risk. The guideline doesn't break down that the risk has to be actual, the risk has to be potential, or some combination of the two. Under the facts here, and which the judge heard, both at sentencing and sitting as the trial judge, he was allowed to look at the record as a whole. He saw the exhibits, he heard the testimony of the officers, including Officer Cole and Officer Blanchflower, who was one of the other officers in the alley. And the judge can certainly find, because we're talking about a preponderance here, that under these circumstances, the defendant's conduct created that risk. What if the facts were different? What if there were no window? And what if the officers were standing side by side and there wasn't one officer behind the other and a bullet flying by that officer? Would your argument be the same? It would, Your Honor, because, again, the guidelines don't differentiate between actual risk and potential risk. Certainly in this case, we have both. We have the risk, we have substantial risk. What if it was one officer? One officer pursuing, chasing him back into an alley. The person has a gun, but the gun's not loaded. There is no window. Under the same circumstances in a downtown area, right after morning rush, about 10 o'clock in the morning, the government's position in that circumstance, since you're asking me to speculate, would be the same because there's the potential risk when you're shooting upward that there's a possibility that the round may land somewhere in a crowded area of downtown Lancaster. The government's analysis would be different. But our point here is you're in a back alley. The chances of that certainly are not substantial. It's going to hit up there and bounce all the way out to the street and have such force and such velocity, by the time it gets to the street, it could penetrate someone's body. I think that there's a difference, Your Honor, if you're talking about a ricochet, which is certainly an issue toward the people in the alley, versus if the round goes straight and then comes down. I think there that's certainly the possibility of causing risk of serious bodily injury. Certainly a ricochet over the building is a different matter. Conceding that theoretically there is some risk, you're not arguing that's a substantial risk, correct, in the situation we gave you? One officer chasing a person into a back alley, it's walls there, no window, there's no pedestrians or nobody from the street nearby, anywhere nearby, and the gun is not loaded. If we're talking about, again, this is hypothetical, Your Honor, if we're talking about a ricochet, I would agree with the court that absent some type of expert testimony to talk about danger to the officer in the alley, the government's case is certainly more difficult. If we're not talking about a ricochet, then I think the analysis is the same. In that situation, there isn't a substantial risk. If we're talking about a ricochet in that hypothetical, I would agree with the court. If we're not talking about a ricochet, I think the analysis is the same. In this case, your two points that show that there was a substantial risk was that there was a window within one of the walls, so it wasn't a solid wall. The back wall, that's correct. Somebody could have been there, so that was clearly recklessly creating a substantial risk of bodily injury, and that there were two officers both shooting nearby, and one possibly could have clipped the other. That's correct. Again, as I've talked about before, there is, in this case, not in the hypothetical, but certainly in this case, we have an actual risk to an identified person, Officer Cole, as well as the possible risk toward others in the area, including someone who may have been behind the window. That's correct, Judge Ambrose. You're abandoning any assertion that a ricochet could cause a substantial injury to somebody? No, Your Honor. My answer to the ricochet was in response to Judge Ambrose's hypothetical of a one-on-one person in the alley. Certainly here, according to the trial testimony, there were more people. Again, the hypothetical, I think, may certainly change that. But no, certainly in this circumstance, with the amount of officers in the area back there, the fact that this is, again, second armed bank robbery in two days, downtown Lancaster, I think the risk is certainly greater there than in the hypothetical I was given by Judge Ambrose. So under these facts, we're not abandoning that argument. Do you want to address the last point we talked about with Mr. Rafael? The double-counting argument? Yeah. I'll first indicate to the Court that double-counting under the guidelines is permissible if the Commission intended the result, and if the result is permissible  And actually, Your Honor, your question to Mr. Rafael is essentially the government's position. 2K2.4 is included in Chapter 2, and it talks about specific offense enhancements the government would argue under Chapter 2, and that punishes the underlying conduct, in this case, the robbery. Chapter 3, where 3C1.2 comes in, is, as the Court indicated, I believe, that's what the Commission entitled that section. And it punishes separate conduct. In this case, it punishes reckless endangerment of others during flight for a law enforcement officer. And in this case, the judge and the probation department properly did not enhance the defendant's sentence under Chapter 2 because of the 924C conviction. Without the 924C conviction, the defendant would have been subject to a 6-level increase for using a firearm during the commission of the bank robbery. And the judge didn't apply that here because of the 924C conviction. Because we're talking about separate notions or separate conduct-related sentencing, one in Chapter 2 related to the underlying conduct, and one in Chapter 3 related to the victims and the flight afterwards, this is not impermissible double-counting. And both the PSR and the district court's finding that 3C1.2 was applicable was appropriate. We'd ask the Court to affirm. That's all I have, unless the Court has any specific questions. No questions. Good. Thank you very much, Mr. Brown. Mr. Refia? Thank you, Your Honor. First, on a couple of factual matters. The officers were standing immediately next to one another, and that's established by the trial testimony. Officer Cole testified that they were standing immediately next to one another when he came to meet Officer Wagner when she had cornered the defendant. And on page 241 of the Joint Appendix, Officer Blanchflower testified that when he showed up immediately before the officers shot, Cole and Wagner were standing immediately next to one another. What about the testimony that the one officer heard a bullet behind him? Your Honor, he heard that bullet behind him to his right side. It's not clear from the record whether that's because Wagner was standing behind him to his right side or whether that's where the sound occurred for him, whether he heard an echo. But the trial testimony about the person who saw the two of them standing side by side was Paul Blanchflower, and he said immediately next to one another. Sure, but it's possible that they changed. They weren't stationary the entire time. Correct, Your Honor. They could have been standing side by side, and one could have moved up or behind. Correct, but Paul Blanchflower, by his trial testimony, showed up essentially at the time the officers were firing, and he popped his head into the alley to see what was going on after they had taken their shots. Your Honor, I think the government is confused here about the continuum of potential risk to substantial risk. Potential risk, the type discussed by the Supreme Court in Jeans Against the United States, can be attenuated. It can be distant. But substantial risk cannot be. Substantial risk is a descriptor of a particular type of actual risk. It needs to be real. It needs to be meaningful. It needs to be substantial. It cannot be imaginary. It cannot be attenuated. Since substantial risk was required here and the government adduced no evidence showing substantial risk, 3C1.2 cannot apply. It did not show a person in the building behind the defendant. It did not show where he was in relation to the window. It did not show what type of building was behind him. Was it a restaurant? Was it a home? Was it a business that was in operation at the time? And finally, the type of ricochet that would be required to do harm to the officers, boomerang ricochet, is such a preposterous result here that it cannot ground the application of 3C1.2. Can you make the argument that when guns and bullets are involved, that even the slightest risk is a substantial risk? That is, a few centimeters can make the difference between life and death. That's correct, Your Honor, but a person has to be within a few centimeters of that bullet to be harmed in the first place. On the facts of this case, bound on three sides by solid walls with no evidence that there was anybody in the structure behind the defendant, there is no one other than the defendant, no other person required to ground the application of 3C1.2. Let me ask a question that I think is probably the same thing that Chief Judge Sirica just asked. Is it appropriate to view risk as a function of two things? First, the gravity or the magnitude of the bodily injury that could occur, if the eventuality, the risk were realized, and the likelihood that the injury would occur. In other words, it's substantial risk of bodily injury, right? Yes, Your Honor. So you're looking at two things. Is it fair to say that the higher the gravity or significance of the injury that could occur, you could have at the same time a lowering of the likelihood that it could occur, and still in combination by multiplying the gravity of the harm against the risk that it could occur, still view that as substantial? No, Your Honor. Do you understand what I'm trying to ask? Yes, I do, and I disagree respectfully, Your Honor. And that's what I want you to address. I think those are two linked but unrelated, non-overlapping concepts. The seriousness of the bodily injury is something that's addressed by the type of harm that could arise to the person exposed to the risk itself. So certainly they're related, but the likelihood of the risk and the substantiveness of the risk is a separate concept from the type and gravity of injury that can arise. Certainly, bullets hitting someone can cause a great deal of harm. But if you're firing bullets in a controlled area, in a remote area, away from any other people, there's no substantial corrector on it. And in this case, while it wasn't a firing range or an area where safety protocols specifically relating to guns were present, it was a bounded area. And the government had the opportunity to present evidence that there was a danger to a person outside that bounded area. It did not do so. It deduced no evidence, despite having it readily available to it, to ground the application of 3C1.2 to establish a substantial risk to another person. And for those reasons... Well, they're saying that there was a risk to the police officers by virtue of a ricochet or possibility of getting in the line of fire. Well, Your Honor, I don't think the officers were in the line of fire. As you said when Mr. Brown was arguing, the officers are well-trained to take safe shots and mirror around one another, not towards one another. And as I said in my reply brief, the chance of a bullet shank, boomerang ricochet, is so incredibly distant that it cannot ground the application of 3C1.2 here. Good. Thank you both very much. The case was extremely well argued by Mr. Brown and by Mr. Raphael. We find it very helpful. I notice, Mr. Raphael, that you're listed as a research and writing attorney. Is that still your position? Yes, Your Honor. I think Mr. Brown would agree that you ought to argue some more cases here. You've been a worthy opponent. Thank you, Your Honor. Good. Thank you both very much.